1

2

3

4

5

6

7                               UNITED STATES DISTRICT COURT

8                              NORTHERN DISTRICT OF CALIFORNIA

9

10      JENNIFER K LOVETT,

                                                    Case No. 14-cv-02844-RS
11                         Plaintiff,

12              v.

13                                                  **ORDER GRANTING IN PART AND**
        OMNI HOTELS MANAGEMENT                      **DENYING IN PART DEFENDANT'S**
14      CORPORATION,                                **MOTION FOR SUMMARY JUDGMENT**

15                         Defendant.

16

17                              **I.      INTRODUCTION**

18           Plaintiff Jennifer Lovett suffered a terrible injury to her left eye while she was a guest at

19      defendant Omni Hotels Management Corporation's San Francisco hotel when she took advantage

20      of the "Get Fit Kit"—a duffel bag with small exercise equipment suitable for in-room exercises.

21      Included in the kit was a Xering, manufactured by non-party SPRI, which comprises a ring-shaped

22      elastic band, intended for lower-body exercises. The kit did not include any instructions

23      explaining how to use the elastic band. Undeterred, Lovett imitated upper body exercises she had

24      done before: she placed the ring around her feet to perform a rowing exercise. As Lovett pulled

25      the band towards her hips, her feet came off the ground. Suddenly, the ring slipped off the bottom

26      of her feet, forcing her hand back towards her face and into her eye. The impact caused her

27      irreparable eye damage.

28           Lovett contends that her injuries were foreseeable and preventable had Omni (1) performed

United States District Court
Northern District of California

1    a risk assessment of the items in the kit and (2) provided instructions for how to use the Xering.

2    She insists that Omni is liable for negligence (Claim 1) and negligently distributing a product

3    without proper warnings (Claim 3).  In addition, Lovett claims that Omni manufactured and

4    promoted the kits, thereby exposing them to strict product liability for the defective product

5    (Claim 2).  Omni moves for summary judgment on all three claims.

6          Service providers do not bear the burden of strict liability for the products they use.  Omni

7    did not sell the kits or their component parts, and therefore no reasonable jury could conclude that

8    Omni was anything other than a service provider.  Accordingly, summary judgment must be

9    granted with respect to Lovett's claim for strict liability (Claim 2).

10          In contrast, a jury could reasonably decide that Omni failed to take reasonable measures to

11   prevent foreseeable harms.  Although this case presents a close question of whether Omni owed

12   Lovett a duty, there are material disputes of fact, which preclude summary judgment on Claims 1

13   and 3.  Critically, when looking at the Xering, proper use of the device is not obvious.  Simple

14   instructions, such as the instructions SPRI ordinarily distributes with its product, would mitigate

15   the risks of using the band.  Moreover, Lovett has offered sufficient evidence to conclude that

16   Omni had a duty to inspect products it distributed to its guests, and its failure to consider whether

17   they would misuse the band was a breach.  Claims 1 and 3 may therefore advance to trial.

18                    **II.    FACTS AND PROCEDURAL HISTORY**

19        **A.  Omni's Get Fit Kit**

20          Omni operates approximately fifty-five hotels in the United States.  In an effort to

21   differentiate its hotels from competitors' accommodations, Omni commissioned Case-Dunlap

22   Enterprises d/b/a Tic Toc ("Tic Toc") to develop an in-room exercise kit, which Omni named the

23   "Get Fit Kit."  Cheng Decl. Ex. 3, Kesinger 30(b)(6) Dep. at 14:6-21; 15:9-12; 15:24-16:10;

24   37:8-21.  Since developing these kits, Omni has made them available to guests who wish to

25   workout in their rooms, but does not offer kits for sale.  Smith Decl. ¶ 8.  Those who are members

26   of Omni's loyalty program may request a kit when making online reservations, but the kit is

27   available to all guests.  Cheng Decl. Ex. 7 at OMNI000055-59; Cheng Decl. Ex. 8, Lovett Dep. at

28
                    ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
                                        CASE NO.  14-cv-02844-RS

United States District Court
Northern District of California

1    63:21-23; 66:12-13; Smith Decl. ¶ 8.

2         When Omni engaged Tic Toc, the entities divided up responsibility for the creation and

3    assembly of the kit.  Tic Toc was responsible for ordering the items for the kit from various

4    manufacturers, and then sending the items to Omni, which placed all items in the duffel bags.

5    Cheng Decl. Ex. 2, Gittemeier Dep. at 100:15-20.

6         Since initially developing the kit, Omni and Tic Toc worked together to select the

7    components of the kits.  Omni reviewed the items in the kit and identified which equipment it

8    liked and disliked, *see* Cheng Decl. Ex. 11 (Emails), ultimately settling on the following items:

9    (1) an Omni duffle bag; (2) the SPRI Xertube; (3) the SPRI Xering;[1] (4) an exercise mat; and (5)

10   two dumbbells, Cheng Decl. Ex. 7 at OMNI000005.  The kit did not include any instructions for

11   how to use the various items in the bag, Kesinger 30(b)(6) Dep. at 58:2-23, because SPRI does not

12   provide use instructions to Tic Toc.  Rector Decl. Ex. 9, Gittemier Dep. at 117:12-15; *see also*

13   Rector Decl. ¶ 5 (describing the contents of an SPRI shipment Omni's counsel received from

14   SPRI directly).

15        In the course of reviewing the items in the kit, Omni never consulted with a fitness expert

16   or conducted a safety assessment for the exercise equipment.  *See, e.g.*, Kesinger 30(b)(6) Dep. at

17   31:20-32:9; 34:4-35:1; Cheng Decl. Ex. 5, Smith Dep. at 55:10-20; 60:19-24; 61:21-62:19.  Nor

18   did Omni ask that Tic Toc perform such an assessment.  Gittemier Dep. at 63:10-65:8.  Omni

19   employees concluded the items in the kit were easy to use and, without consulting a fitness expert,

20   never inquired about instructions or warnings.  Smith Dep. at 57:20-58:3; 60:19-24; 65:14-25.

21        Since introducing the kits, guests have requested them 90,652 times.  McNamara Decl. ¶ 6.

22   According to Omni's records, only Lovett has reported injury or misuse.  *Id.*

23        **B.  Lovett's Accident**

24        Lovett was guest in Omni's San Francisco hotel during a business trip.  When making the

25   online reservation, she requested that Omni place a kit in her room.  Lovett Dep. at 66:12-13.

26

27   [1] The Xering is a blue, ring-shaped tube approximately seven inches in diameter.  Chou Decl. ¶ 10.

28                                    ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
                                                                            CASE NO.  14-cv-02844-RS

United States District Court
Northern District of California

3

1  After working out in the gym, Lovett returned to her room to do conditioning exercises.  She

2  opened the duffel bag and pulled out the items, including the Xering.[2]  Lovett Dep. at 93:2-95:15.

3  Having never seen exercise bands like the Xering, Lovett looked for instructions or suggested

4  exercises, but did not find any.  Lovett Dep. at 105:7-13.  Nevertheless, Lovett decided to use the

5  bands as she had used resistance bands before and thought she could replicate those exercises.

6  Lovett Dep. at 106:19-23; 108:4-14.  In the past, she had used resistance bands with two handles,

7  but never one in the shape of a ring.  Lovett Dep. at 23:24-24:4; 25:21-26:4; 111:2-8.  One of the

8  exercises she had seen involved sitting on the floor at a 90-degree angle and pulling the band

9  towards the hips.  Lovett Dep. at 62:21-63:4.  In an effort to mimic this exercise, Lovett sat on the

10  floor with her legs extended and placed the Xering around her feet and began pulling the band

11  towards her body in a rowing motion.  Lovett Dep. at 122:15-123:11.  As Lovett pulled the band,

12  her feet came off the floor, and the band rolled over the top of her shoes, which caused her left fist

13  to recoil backwards into her left eye.  Lovett Dep. at 123:11-14.  The injury was so severe that her

14  eye had to be removed.  Lovett Dep. at 160:8-9.

15  ### C.  Lovett's Expert Witnesses

16  Lovett has retained three expert witnesses—Paul Laesecke, Mark Cibrario, and Brad

17  Wong—who have submitted declarations in support of Lovett's opposition to Omni's motion for

18  summary judgment.  Laesecke has worked in the hotel industry since 1967 as a manager, director,

19  and vice president.  He has also taught at various schools of hotel management throughout his

20  career.  According to Laesecke, the hotel industry operates on the understanding that hotels

21  "should not distribute goods, services or customer amenities to [their] guests without knowing

22  how the hotel guest is likely to use or misuse the specific amenity or item," including fitness

23  equipment.  Laesecke Decl. ¶¶ 15, 18.  In light of this practice, Laesecke concluded that "Omni

24  should have undertaken a reasonable assessment of the inclusion of the SPRI Xering resistance

25  bands . . . to determine how they would be used and potentially misused by hotel guests before

26

27  [2] The Xertube, a rope-like resistance band, was not included in the kit Lovett used.

28  ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO.  14-cv-02844-RS

United States District Court
Northern District of California

1   distributing [them]." Laesecke Decl. ¶ 26. In addition, he believes that, "at a minimum," Omni

2   should have included instructions for how to use the equipment in the kit. *Id.*

3        Cibrario is a certified strength training specialist and personal trainer. He consulted with

4   SPRI to develop instructions for the proper use of the Xering, Cibrario Decl. ¶¶ 1-2, and explained

5   that it "is only intended for lower body work outs," which, if performed correctly, results in "no

6   foreseeable risk of injury to the face or eyes." Cibrario Decl. ¶ 3.

7        Lovett's third expert, Wong, is a licensed professional mechanical engineer and forensic

8   consultant, who has examined the kits and concluded that instructions for how to use the Xering

9   should have been included. In particular, Wong has described the risk assessment he contends

10  Omni should have conducted and believes that, had Omni conducted this risk analysis, it "should

11  have known that use instructions were necessary to eliminate the risk of misuse and injury."

12  Wong Decl. ¶ 10-11.

### III.   LEGAL STANDARD

14       A party is entitled to summary judgment when "there is no genuine dispute as to any

15  material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

16  The party who seeks summary judgment bears the initial responsibility of identifying an absence

17  of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the

18  moving party satisfies this initial burden, the non-moving party must present specific facts

19  showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

20  "Only disputes over facts that might affect the outcome of the suit under governing law" are

21  material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists if the

22  non-moving party presents evidence from which a reasonable fact-finder, viewing the evidence in

23  the light most favorable to that party, could resolve the material issue in his or her favor. *Id.* at

24  248-49.

25       Lovett advances claims arising under California law. As this is a diversity suit, this "court

26  must apply the law as it believes the California Supreme Court would apply it." *Edgerly v. City &*

27  *Cnty. of San Francisco*, 713 F.3d 976, 982 (9th Cir. 2013) (internal quotation marks omitted).

28

United States District Court
Northern District of California

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02844-RS

1   "Where there is no convincing evidence that the state supreme court would decide differently, a

2   federal court is obligated to follow the decisions of the state's intermediate appellate courts."

3   *Beeman v. Anthem Prescription Mgmt., LLC*, 689 F.3d 1002, 1008 (9th Cir. 2012) (en banc)

4   (internal quotation marks omitted).

### IV.   DISCUSSION

#### A.  Evidentiary Matters

7   Omni objects to the admission of the declarations of Laesecke and Wong on the grounds

8   that their testimony is unreliable.  To testify at trial as an expert, Rule 702 of the Federal Rules of

9   Evidence requires that the witness be qualified by "knowledge, skill, experience, training, or

10  education."  Fed R. Evid. 702.  Even if a witness is qualified as an expert in a particular field, any

11  scientific, technical, or specialized testimony is admissible only if it (a) "will help the trier of fact

12  to understand the evidence or to determine a fact in issue," (b) "is based upon sufficient facts or

13  data," (c) "is the product of reliable principles and methods," and (d) "the expert has reliably

14  applied the principles and methods to the facts of the case."  *Id.*

15  Expert opinion testimony is reliable if such knowledge has a "basis in the knowledge and

16  experience of [the relevant] discipline."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592

17  (1993).  The following factors inform whether to admit expert testimony:  (1) "whether a theory or

18  technique can be (and has been) tested," (2) "whether the theory or technique has been subjected

19  to peer review and publication," (3) "the known or potential rate of error," and (4) whether the

20  method the expert uses is generally accepted in the scientific community.  *Daubert*, 509 U.S. at

21  593–94.  This list is not exhaustive, however, and the standard is flexible.  *Kumho Tire Co. v.*

22  *Carmichael*, 526 U.S. 137, 141 (1999).  The *Daubert* inquiry "applies not only to testimony based

23  on 'scientific' knowledge but also to testimony based on 'technical' and other 'specialized'

24  knowledge."  *Id.*

25  The task is not to "decid[e] whether the expert is right or wrong, just whether his testimony

26  has substance such that it would be helpful to a jury."  *Alaska Rent-A-Car, Inc. v. Avis Budget*

27  *Grp., Inc.*, 738 F.3d 960, 969-70 (9th Cir. 2013).  Impeachment alone is not a proper basis for

28  
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO.  14-cv-02844-RS

United States District Court
Northern District of California

1    exclusion because an expert's opinion is always assailable through cross-examination. *Daubert*,

2    509 U.S. at 596. The analysis should instead focus on the principles and methodology employed,

3    not the conclusions reached by the expert. *Id.* at 595. Ultimately, the purpose of the assessment is

4    to exclude speculative or unreliable testimony to ensure accurate, unbiased decision-making by the

5    trier of fact. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district

6    court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the

7    expert." *Kumho*, 526 U.S. at 157 (internal quotation marks omitted).

8        *1.    Declaration of Paul Laesecke*

9        Although Omni has not filed a formal motion to exclude Laesecke's testimony, it objects

10   to Laesecke's description of the industry standards. Specifically, Omni takes umbrage at

11   Laesecke's claim that "[t]he general standard of reasonable care owed by an innkeeper to its

12   paying guests has resulted in the industry adopting the rule that prior to providing a service, item,

13   product or amenity, a reasonably prudent innkeeper should undertake risk analysis of the item."

14   Laesecke Decl. ¶ 16. Omni complains that Laesecke cites no formal rules or ordinances to

15   substantiate his claim, and therefore his opinion is inadmissible *ipse dixit*.

16       At this stage, the task of assessing the reliability of Laesecke's opinions is difficult without a

17   proper *Daubert* hearing. Laesecke's declaration establishes that he has extensive experience

18   working in the hotel industry and teaching in hotel management programs. Those professional

19   experiences inform his view that the hotel industry has adopted a general practice of conducting

20   risk assessments. This sort of experience-based expertise is permissible under Rule 702, provided

21   the witness describes his or her relevant background and experience. *See, e.g.*, *Den Norske Bank*

22   *AS v. First Nat. Bank of Boston*, 75 F.3d 49, 57-58 (1st Cir. 1996) (permitting a banking executive

23   who had worked in banking for forty years to testify about the industry custom to allow minority-

24   participant vetoes); *Ji v. Bose Corp.*, 538 F. Supp. 2d 354, 359 (D. Mass. 2008) (allowing a casting

25   director for photo shoots to testify about customs and practices in the modeling industry relative to

26   photographer rights). Of course, there are limits to an expert's ability to testify about customary

27   practice. For example, a proffered travel industry expert may not be in the position to testify about

28

United States District Court
Northern District of California

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02844-RS

7

United States District Court
Northern District of California

1   the customs of the cruise line business specifically if he or she never worked for a cruise line.  *See*

2   *Samuels v. Holland Am. Line-USA Inc.*, 656 F.3d 948, 953 (9th Cir. 2011).  Or, in the absence of a

3   "bright-line rule" or "qualitative analysis," a veteran police officer may not testify about how

4   many excessive force complaints are too many.  *See Thomas v. City of Chattanooga*, 398 F.3d

5   426, 431-32 (6th Cir. 2005).

6       Here, however, Laesecke has identified two "bright-line rules" in the hotel industry:  (1) that

7   hotel operators must conduct a risk assessment before providing a service, and (2) that the hotel

8   industry understands exercise equipment is potentially risky.  Laesecke Decl. ¶¶ 16, 18.  He has

9   applied that general practice to the situation presented in this case and "explain[ed] how that

10  experience leads to the conclusion reached . . . ."  Fed. R. Evid. 702 advisory committee's note.

11  Thus, Omni has not demonstrated that Laesecke's opinions are inadmissible, but may cross-

12  examine him at trial about how he identified these industry-wide practices.

13      *2.      Declaration of Brad Wong*

14      Omni also challenges the reliability and admissibility of Wong's opinions regarding

15  whether exercise bands should include instructions.  Omni complains that Lovett's attorney

16  omitted certain pages from an exhibit to Wong's declaration during the first round of summary

17  judgment briefs before the request for leave to amend the complaint was granted.  Why the fact or

18  timing of this omission is prejudicial or relevant to Omni's challenge to Wong's declaration

19  remains unclear.  Omni is capable of challenging the basis for Wong's opinion "in the crucible of

20  cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

21      In addition, Omni objects to the following statement:  "According to various national

22  standard and certifying organizations, instructions for safe use are required for consumer fitness

23  products like the Xering resistance bands and Xertube resistance bands."  Wong Decl. ¶ 10.  Wong

24  refers to two manuals, which arguably pertain to only mechanical stationary equipment.  The first,

25  "Standard Specification for Fitness Equipment," defines "fitness equipment" as a "mechanical

26  device or hardware designed for use in exercising specific or multiple muscles of the body."

27  Wong. Decl. Ex. 6, ASTM F2276-10, § 3.1.9.  Specifically excluded from the definition of

28

1    "fitness equipment" are "toys used for recreation, jump ropes, outdoor and indoor playground

2    equipment or facilities, bicycles or other fitness soft goods such as gloves, belts, apparel, balls,

3    and so forth." *Id.* § 3.1.9.1.  The second standard Wong references is the ISO 20957-2 for

4    "stationary training equipment—strength training equipment, additional specific safety

5    requirements and test methods."  Wong Decl. Ex. 7, ISO 20957-2.  That standard applies to

6    "strength training equipment with stack weight resistance or other means of resistance like weight

7    discs, *elastic cords,* hydraulic, pneumatic and magnetic systems and springs . . . ." *Id.* at 1

8    (emphasis added).

9            These standards are not so obviously inapplicable to elastic bands, like the Xering, such

10   that Wong's testimony must be excluded.  While Omni may be correct that these standards do not

11   govern resistance bands, the exhibits and declaration in the record do not provide a basis to

12   exclude Wong's opinions.  Wong does not fully explain whether he is using the manuals to

13   extrapolate to elastic bands.  Moreover, the ISO 20957-2 specifically mentions that the standard

14   applies to elastic chords.  This record simply does not provide a basis to exclude Wong's

15   testimony.  Omni is free, of course, to cross-examine Wong at trial about the applicability of these

16   two standards.

17           Finally, Omni challenges the reliability of Wong's opinion testimony about whether

18   Lovett's injury could have been prevented had the kits included instructions.  *See* Wong Decl. ¶¶

19   14–16.  An expert must be knowledgeable, which "connotes more than subjective belief or

20   unsupported speculation."  *Daubert*, 509 U.S. at 590.  Wong's opinions about what might have

21   been, however, are just that—unsupported speculation—and therefore improper expert opinion.

22   Accordingly, Omni's objection to this aspect of Wong's testimony is sustained.

23           **B.  Omni's Duty to Lovett**

24           To prevail on her negligence claims, Lovett must prove that (1) Omni owed her a legal

25   duty, which (2) it breached, and (3) the breach was the proximate cause of her injuries.  *Lawrence*

26   *v. La Jolla Beach & Tennis Club, Inc.*, 231 Cal. App. 4th 11, 21 (2014).  Here, Lovett avers that

27   Omni owed her (and other guests) a duty to ensure the kit was safe before distributing it.  She

United States District Court
Northern District of California

28

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO.  14-cv-02844-RS

1    contends Omni breached that duty one of two ways.  First, she argues Omni should have

2    performed a risk assessment before procuring the Xering and distributing it to guests.  Second,

3    Lovett insists that Omni failed to ensure the kits included instructions about how to use the Xering

4    properly.

5           With respect to their guests, hotel owners are obliged "to protect them against

6    unreasonable risk of harm."  *Id.* at 22 (internal quotation marks omitted).  The question is rarely

7    *whether* the hotelier owed his or her guests a duty, but rather what the scope of that duty is.  *Id.* at

8    23.  "A court deciding . . . the scope of a [hotel owner's] duty should limit its inquiry to the

9    specific action the plaintiff claims the particular landlord had a duty to undertake" before

10   balancing the risks and harms at issue.  *Id.* (internal quotation marks omitted).  "[A] hotel owner

11   or 'innkeeper' owes a duty to its guests to maintain the premises in a reasonably safe condition"

12   and to "be reasonably diligent in inspecting its rooms for defects, and correcting them upon

13   discovery."  *Id.* at 22 (internal quotation marks omitted).  If the owner had actual or constructive

14   knowledge of a dangerous condition, then he or she is liable for harms caused by that condition.

15   *Howard v. Omni Hotels Mgmt. Corp.*, 203 Cal. App. 4th 403, 431 (2012).  Omni denies that it

16   owed Lovett any duty to make the Xering safer or include instructions because (1) it did not have

17   any knowledge of the alleged risks; (2) the risk was obvious; and (3) Lovett assumed the risk that

18   the band would whip back towards her face.

19           *1.  Knowledge*

20           Thousands of guests at Omni's numerous properties have used the Xering without

21   instructions and without incident.  This fact alone, Omni argues, definitively establishes that it was

22   unaware its guests could misuse the product.  "Safety-history, including the presence or absence of

23   prior accidents under similar use," is certainly relevant to the question of foreseeability in cases

24   where the plaintiff alleges a product was defective because the warnings were insufficient.

25   *Benson v. Honda Motor Co.*, 26 Cal. App. 4th 1337, 1344-45 (1994) (internal quotation marks

26   omitted).  Nevertheless, the absence of prior similar accidents does not definitively establish that

27   no injuries have occurred or that a risk assessment would not reveal the potential for injury.  *See*

28
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02844-RS

United States District Court
Northern District of California

1    *id.* at 1346 ("Nonetheless, lack of notice does not establish that no injuries had occurred, and it

2    may not preclude the conclusion that the product was defective and unreasonably dangerous."

3    (internal quotation marks and alterations omitted)).

4             Although the many years of Xering use without incident raises a strong inference that

5    misuse was a foreseeable problem, Omni is not entitled to summary judgment for that reason

6    alone.  To start, that no Omni guests have reported injuries like those to Lovett's eye does not

7    establish that guests did not misuse the product.  There remains the possibility that guests did not

8    use the Xering at all, that guests misused the product without injuring themselves, that they chose

9    not to report to Omni management injuries they incurred, or that they misused the product without

10   incident.

11            More to the point, Omni overlooks Lovett's theory of the case.  When determining whether

12   a defendant owes a duty, the first step is to "determine the specific measures the plaintiff asserts

13   the defendant should have taken to prevent the harm" before "analyz[ing] how financially and

14   socially burdensome these proposed measures would be" and the foreseeability of the harm that

15   could have been prevented.  *Vasquez v. Residential Invs., Inc.*, 118 Cal. App. 4th 269, 285 (2004).

16   "Where the harm can be prevented by simple means, a lesser degree of foreseeability may be

17   required."  *Id.* (internal quotation marks omitted).  Lovett need not show that the exact injury she

18   suffered was foreseeable; she must show only that Omni's conduct—the failure to conduct a risk

19   assessment and failure to include instructions about how to use the Xering—created a risk of a

20   "particular kind of harm."  *Id.* at 286 (internal quotation marks omitted).

21            Lovett contends that Omni owed her a duty, at the very least, to assess whether and how

22   guests might misuse the items in the kit.  Had Omni done so, she insists, its managers would have

23   realized many people do not understand how to use the Xering and routinely misuse the product.

24   To support this contention, she identifies three Omni employees who all believed the Xering could

25   be used to strengthen the upper body.  For example, Paul Kesinger, the Director of Loss

26   Prevention, thought the Xering should be held "like you're driving a car and to kind of expand the

27   band and then bring it back in."  Kesinger Dep. 68:1–6.  Meredith Malloy, the Director of

United States District Court
Northern District of California

28   ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
     CASE NO. 14-cv-02844-RS

1   Procurement, thought that the Xering was "something you use with both hands and pull.  And as it

2   pulls, it retracts."  Malloy Dep. 80:25–81:6.  Finally, Jeff Smith, who was responsible for

3   implementing the concept of the kit, thought that the band could be used however the guest liked.

4   *See* Smith Dep. 57:20–58:25; 60:10–18.  Cibrario, who developed exercises for proper use of the

5   Xering, has stated that the proposed exercises Kesinger, Malloy, and Smith mentioned are unsafe

6   because a user could strain her wrist, forearm, or low back, or the band could come loose and snap

7   backwards towards her face or eyes.  Cibrario Decl. ¶¶ 4-6.  In light of this evidence, Lovett has

8   demonstrated that misuse of the Xering was sufficiently common such that Omni could have

9   identified this tendency for dangerous misuse.

10          Omni complains that the cost of requiring its employees to search for SPRI's instructions

11   online or to call SPRI to figure out how to use the Xering properly is too high.  Instead, Omni

12   proposes to shift the onus for that research onto its guests, including Lovett, who, it contends,

13   could have searched for SPRI instructions on their smartphones.  Lovett has introduced ample

14   evidence, however, that Omni was in a superior position to assess the risks of using the Xering.

15   She has shown that Omni took a hands-on approach to developing the kit by selecting which

16   products to include and which components to reorder.  *See* Cheng Decl. Ex. 11 (Emails).  That

17   level of care and attention raises a reasonable inference that Omni was in a superior position to

18   evaluate whether to include warnings and instructions and thereby to foster a safe workout

19   experience.

20          On this record, the cost of performing a risk assessment and distributing instructions with

21   the kits appears minimal.  According to Laesecke, the hotel industry routinely conducts risk

22   assessments of products and services offered to guests.  *See* Laesecke Decl. ¶¶ 15-20 (describing

23   the custom in the hotel industry).  That there is a custom and practice to review items distributed

24   to guests suggests that the additional cost of performing a risk assessment of the kits was minimal.

25   Moreover, the cost of distributing the existing SPRI instructions for use of the Xering would likely

26   be low because instructions already exist.  *See* Chou Decl. Ex. C (SPRI Xering Instructions).

27   Accordingly, on balance the risk associated with foreseeable misuse of the Xering outweighs the

28

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02844-RS

United States District Court
Northern District of California

1    relatively minor cost of conducting a risk assessment and including instructions with the kit, and

2    Omni had a duty to identify and to mitigate those risks by including instructions for proper use.

3                    *2.   Obvious Danger*

4            Omni makes much of the fact that any reasonable person would know there is an inherent,

5    obvious risk to pulling an elastic band.  There is no duty to warn "when 'the danger, or potentiality

6    of danger[,] is generally known and recognized.'"  *Maneely v. Gen. Motors Corp.*, 108 F.3d 1176,

7    1179 (9th Cir. 1997) (quoting *Bojorquez v. House of Toys, Inc.*, 62 Cal. App. 3d 930, 933 (1976)).

8    "Although the question of whether a duty exists is one of law, the question of whether a risk is

9    obvious or generally known is one of fact and thus should be decided by the trier of fact when

10   reasonable minds may differ."  *Id.* (citation and internal quotation marks omitted).  Numerous

11   courts have held the dangers inherent in pulling an elastic band are so obvious that manufacturers

12   need not warn consumers of the dangers associated with the act.  *See, e.g.*, *Bojorquez*, 62 Cal.

13   App. 3d at 934 (holding that there was no duty to warn of the dangers of a sling shot because

14   "[e]ver since David slew Goliath young and old alike have known that slingshots can be

15   dangerous and deadly"); *Van Dettem v. K-Mart Corp.*, 479 N.E.2d 1104, 1106 (Ill. App. Ct. 1985)

16   (holding that a seat cover with an elastic band was not defective for lack of warnings).

17           Omni focuses particular attention on *Jamieson v. Woodward & Lothrop*, 247 F.2d 23, 25

18   (D.C. Cir. 1959), where the plaintiff sued for failure to warn of the dangers associated with using

19   an elastic exerciser resembling a skipping rope.  The rope came with illustrations of eight

20   exercises to perform with the rope.  *Id.*  The plaintiff chose to perform one of those suggested

21   exercises, *see id.* at 28-29, lay on the floor, put the rope under her feet, hold the handles of the

22   band, and raise her feet straight up, *id.* at 25.  Unfortunately, the rope slipped off her feet and hit

23   her in the eye.  *Id.*  The D.C. Circuit held that risks of using the band and performing this exercise

24   were obvious:  "Surely every adult knows that, if an elastic band, whether it be an office rubber

25   band or a rubber rope exerciser, is stretched and one's hold on it slips, the elastic snaps back."  *Id.*

26   at 28.

27           Omni contends that the reasoning of *Jamieson* is applicable here, and therefore Omni had

28                                                   ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
                                                                                          CASE NO.  14-cv-02844-RS

United States District Court
Northern District of California

1    no duty to warn about the dangers of pulling on the Xering.  Again, Omni overlooks Lovett's

2    theory of liability and a critical difference between this case and *Jamieson*.  Lovett contends that

3    the Xering should have come with instructions for proper use—the very sort of instructions that

4    came with the band at issue in *Jamieson*.

5         Moreover, the obviousness of potential danger cuts against Omni to some extent.  *See*

6    *Osborn v. Mission Ready Mix*, 224 Cal. App. 3d 104, 122 (1990) ("[A]lthough the obviousness of

7    a danger may obviate the duty to *warn* of its existence, if it is *foreseeable* that the danger may

8    cause injury despite the fact that it is obvious (e.g., when necessity requires persons to encounter

9    it), there may be a duty to *remedy* the danger, and the breach of that duty may in turn form the

10   basis for liability, if the breach of duty was a proximate cause of any injury." (emphasis in

11   original)).  The Xering was made to be pulled.  There are numerous ways to stretch the Xering

12   safely, but there are also numerous ways to misuse the product.  Because every reasonable person

13   understands that pulling an elastic band poses some risks, Omni was also constructively aware that

14   guests would pull on the bands, which would pose risks to their physical safety.  Lovett's whole

15   theory is that Omni should have mitigated the obvious risk of harm by (1) performing a risk

16   assessment, and (2) providing instructions for how to use the Xering safely.  Thus, Lovett has

17   demonstrated this case differs from *Jamieson* and its ilk.  A reasonable jury could decide the risk

18   of using the Xering to exercise the upper body was not so obvious as to eliminate Omni's duty to

19   perform a risk assessment or provide instructions.

20              *3.   Assumption of Risk*

21         Omni's final argument is that Lovett assumed the risk inherent in using the Xering, and

22   therefore it owed her no duty to investigate or to warn of the dangers of use or misuse.  The

23   assumption-of-risk doctrine is a limitation on the scope of a duty owed when the activity involves

24   an inherent risk.  *Nalwa v. Cedar Fair, L.P.*, 55 Cal. 4th 1148, 1154 (2012).  When assessing

25   whether a plaintiff assumed the risk of an activity, the California Supreme Court has instructed

26   that the doctrine should apply if imposing a legal duty would "chill[] vigorous participation in or

27   sponsorship of recreational activities."  *Id.* at 1156.  The premise is that the imposition of tort

28

United States District Court
Northern District of California

1    liability would encourage people to abandon the activity.  *Id.* In situations when an activity

2    involves inherent dangers, "operators, instructors and participants in the activity owe other

3    participants only the duty not to act so as to *increase* the risk of injury over that inherent in the

4    activity." *Id.* at 1154 (emphasis in original).

5         Omni heavily relies on *Cann v. Stefanec*, 217 Cal. App. 4th 462 (2013), which involved

6    the inherent risks of weightlifting.  The California Court of Appeal concluded that people who lift

7    weights assume the risk that others might drop weights on them, and thus the plaintiff's teammate

8    was not liable for injuries caused by dropping a set of weights, as she had been instructed to do in

9    the event she could not lift them.  *Id.* at 469-70.  *Cann* is distinguishable from this case because

10   Lovett does not complain about the risks associated with *proper* use of the product.  Instead, she

11   focuses her complaint on the critical fact that there are proper and improper ways to use the

12   Xering.  Although there are certainly inherent risks to pulling an elastic band, the risks to the face

13   and eyes associated with using the Xering are not inherent to the product when it is used properly.

14   Proper use significantly reduces the risk that the band will recoil and cause damage to the face.  At

15   worst, the tension caused by pulling the band may cause bruising or falling, but there is little to no

16   danger that the band would hit and injure the eye or face.  Omni has not presented any evidence

17   that holding hotels that distribute the Xering to their guests liable for failing to include usage

18   instructions would chill participation in the activity.  Indeed, the SPRI use instructions might

19   increase the number of guests who use the Xering (and use it correctly), rather than deter them.

20        Finally, "assumption of risk does not insulate equipment suppliers from liability for injury

21   from providing defective equipment." *Bunch v. Hoffinger Indus., Inc.*, 123 Cal. App. 4th 1278,

22   1300 (2004).  "The act of supplying equipment" and participation in dangerous activity are

23   "separate and distinct," and thus the tests for liability are different.  *Id.* at 1300-01.  Accordingly,

24   under California law, when the consumer is aware of certain risks posed by the defect in the

25   product, "the user's actions are subsumed by comparative negligence," but "the manufacturer is

26   not relieved of its duty to make a product without a defect." *Id.* at 1301.

27        Because Lovett asserts that Omni distributed a defective product, i.e., a product

28        ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
          CASE NO.  14-cv-02844-RS

United States District Court
Northern District of California

15

1    unaccompanied by proper instructions, she did not appreciate fully all the risks inherent in using

2    the Xering.  A jury could still conclude, however, that Lovett appreciated the risks of using the

3    Xering without instructions.  Principles of comparative negligence—rather than assumption of

4    risk—will inform that analysis.

5    **C.  Proximate Cause**

6    To prevail with her negligence claims, Lovett must prove that Omni's failure to conduct a

7    risk assessment for the Xering or to include use instructions was a "substantial factor" leading to

8    her injury. *Lawrence*, 231 Cal. App. 4th at 33.  Ordinarily, summary judgment is not the time to

9    assess proximate cause. *Id.*  Omni insists, however, that it is appropriate here because Lovett did

10   not testify that she would have followed instructions had they been provided.

11   Admittedly, Lovett has offered little evidence to prove proximate causation.  The minimal

12   evidence she has provided, however, is sufficient to withstand summary judgment.  She testified to

13   looking for instructions after opening the kit, which gives rise to a reasonable inference that she

14   would have read them and understood that the Xering is designed to exercise the lower body, not

15   the upper body.  Accordingly, Lovett has provided sufficient evidence for a jury to link Omni's

16   alleged failures to conduct a risk assessment and to provide instructions for the Xering to her

17   injury.

18   **D.  Strict Liability**

19   As a general rule, hotels are not "strictly liable on the basis of products liability for

20   injuries to a guest caused by a defect in the premises." *Peterson v. Superior Court*, 10 Cal. 4th

21   1185, 1210 (1995).  Despite this general rule, Lovett asserts Omni is strictly liable for injuries

22   caused by the Xering because Omni created, manufactured, and promoted the kits which included

23   the Xering.

24   "The doctrine of strict liability in tort applies to producing and marketing enterprises

25   responsible for placing *products* in the stream of commerce." *Pierson v. Sharp Mem'l Hosp., Inc.*,

26   216 Cal. App. 3d 340, 344 (1989) (emphasis in original).  Strict liability attaches to "transactions

27   whose primary objective is obtaining services," but not "where the transaction's service aspect

United States District Court
Northern District of California

28   ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02844-RS

16

United States District Court
Northern District of California

1   predominates and any product sale is merely incidental to the provision of the service." *Id.*

2   Although *Peterson* limited the applicability of strict liability to hotel proprietors, nothing in that

3   holding deprives an injured tenant or guest "of any strict products liability cause of action . . .

4   against the manufacturer, distributor, or retailer of a defective product that causes the injury." *Id.*

5   Indeed, the California Supreme Court expressly did not address "whether different considerations

6   would apply in the event the landlord or hotel owner had participated in the construction of the

7   building." 10 Cal. 4th at 1200.  In such a case, the court suggested that a hotel owner could be

8   strictly liable based on his "status as a builder who engaged in the business of constructing (i.e.

9   manufacturing) rental properties," not his status as an innkeeper. *Id.* at 1200.

10        If hotel operators can be strictly liable, then a plaintiff must demonstrate that they acted as

11   manufacturers or builders, and not as service providers.  To that end, plaintiffs seeking to impose

12   strict products liability must establish that "the transaction's primary objective was to acquire

13   ownership or use of a product," rather than "to obtain a service." *Hennigan v. White*, 199 Cal.

14   App. 4th 395, 403 (2011); *see also Grebing v. 24 Hour Fitness USA, Inc.*, 234 Cal. App. 4th 631,

15   640 (2015) (holding that a gym was not strictly liable for defective gym equipment because the

16   service agreement demonstrated that the primary purpose of the transaction was to obtain

17   services); *Ontiveros v. 24 Hour Fitness Corp.*, 169 Cal. App. 4th 424, 434 (2008) (same).

18        Although the record does not include a service agreement, Omni has demonstrated that

19   the primary purpose of the transaction between Omi and Lovett was service-related.  Guests at

20   Omni hotels pay the same price regardless of whether they choose to use the kit or any other

21   service available. Smith Decl. ¶ 6.  Critically, Omni does not sell the kits or the Xering or even

22   charge rental fees. *Id.* ¶ 8.  While hotels that sell workout kits, shower heads, or beds to their

23   guests are more like retailers and distributers and may be strictly liable for the products they

24   provide guests and offer to sell, Omni is not such a hotel.  The record establishes that Omni was

25   the purchaser, not a retailer of the kits, and thus Lovett cannot show that the hotel engaged in any

26   transaction the purpose of which was to market the kit.  Accordingly, Omni is entitled to summary

27   judgment with respect to her claim of strict liability (Claim 2).

28        ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO. 14-cv-02844-RS

1

### V.    CONCLUSION

2      Because a reasonable jury could conclude that Omni twice failed (no risk assessment and

3 no instructions) to take reasonable steps to prevent harms associated with using the Xering,

4 Omni's motion for summary judgment for Lovett's negligence claims (Claims 1 and 3) must be

5 denied.  Lovett has failed to show, however, that Omni was a manufacturer or retailer of the kits,

6 and thus she may not proceed with her claim for strict liability (Claim 2).

7 **IT IS SO ORDERED**.

8

9 Dated:  February 29, 2016

10 _____

11 RICHARD SEEBORG
United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
CASE NO.  14-cv-02844-RS